## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

DENNIS ANDERSON and KWATERSKI
CONSTRUCTION, INC., on behalf of themselves
and all others similarly situated,

Case No.

**DEMAND FOR JURY**

          Plaintiffs,

          v.

FCA US LLC, F/K/A CHRYSLER GROUP LLC,
a Delaware Corporation.

          Defendant.

## CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**I.** INTRODUCTION ...................................................................................................1

**II.** PARTIES ...........................................................................................................5

    A.     Plaintiffs ......................................................................................... 5

           **1.**    Plaintiff Kwaterski Construction, Inc. ....................................... 5

           **2.**    Plaintiff Dennis Anderson........................................................ 10

    B.     Defendant ..................................................................................... 11

**III.** JURISDICTION AND VENUE.........................................................................12

**IV.** FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS .............................13

    A.     The Class Vehicles Contain EcoDiesel Engines Equipped With a Defective EGR Cooler ................................................................. 13

    B.     FCA Profits From the Popularity of EcoDiesel Vehicles ..................... 14

    C.     The EGR Cooler is Unreasonably Fragile ........................................... 15

    D.     FCA Knew That the EGR Cooler was Susceptible to Cracking........................... 16

    E.     FCA's Investigation and Recall ......................................................... 23

    F.     FCA's Subsequent Failure to Act ..................................................... 25

    G.     The Class Vehicles are per se Defective Because the EGR Cooler Defect Poses an Inherent Safety Risk to Vehicle Occupant........................................... 29

    H.     FCA Concealed the EGR Cooler Defect Affirmatively and via Omissions................................................................................... 30

    I.     FCA Routinely Denies Responsibility for Fixes by Denying Warranty Claims and by Denying Vehicle Fires are Caused by the EGR Cooler Defect............................................................................................ 31

    J.     FCA Also Misrepresented that Loaner Vehicles Would be Provided to Impacted Owners ......................................................................... 34

    K.     FCA Continued to Sell Vehicles With the EGR Cooler Defect Even After Announcing the Recall ............................................................ 35

    L.     Plaintiffs and Class Members Reasonably Relied on FCA's Misrepresentations and Omissions of Material Fact................................ 35

    M.     Allegations Establishing Agency Relationship between FCA and FCA Dealerships.................................................................................... 37

i

**V.** CLASS ACTION ALLEGATIONS ................................................................................40

    A.    Class Definitions ................................................................................ 40

    B.    Class Certification Requirements ....................................................... 41

**VI.** EQUITABLE TOLLING ........................................................................................43

**VII.** CLAIMS FOR RELIEF ........................................................................................45

**VIII.** PRAYER FOR RELIEF.........................................................................................58

**IX.** DEMAND FOR JURY TRIAL................................................................................59

90996535.1

Plaintiffs Kwaterski Construction, Inc. and Dennis Anderson, on behalf of themselves and all others similarly situated, allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## I. INTRODUCTION

1.     Defendant FCA US LLC, f/k/a Chrysler Group LLC ("FCA") designed, manufactured, distributed, and sold hundreds of thousands of Dodge Ram 1500 and 1500 Classic vehicles equipped with 3.0L EcoDiesel engines (the "Class Vehicles") between June 12, 2013 to October 23, 2019 (the suspect class period). The Class Vehicles contain grossly defective EGR coolers.[1]

2.     The EGR coolers are susceptible to thermal fatigue. "Thermal fatigue may cause the cooler to crack internally over time. An EGR cooler with an internal crack will introduce pre-heated, vaporized coolant to the EGR system while the engine is running. In certain circumstances, this mixture interacts with other hydrocarbons and air in the system, potentially resulting in combustion within the intake manifold, which may lead to a vehicle fire."[2]

3.     Owners of the Class Vehicles have already experienced the effects of the Defect, including sudden loss of power and catastrophic vehicle fire.

4.     In June 2019, FCA announced that its 2020 Ram 1500 would be released with an all new third-generation engine, which includes significant changes to the EGR system, including a change to a dual loop (low and high pressure system).[3]

---

[1] Ex. 1, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-3239.PDF.
[2] Ex. 2, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-7573.PDF.
[3] Ex. 3, https://dieselnet.com/news/2019/06fca2.php.

90996535.1

5.     In October 2019, FCA announced a voluntary safety recall of vehicles equipped with these EGR coolers. The recall concerned the 2014–2019 model year Ram 1500 and 1500 Classic trucks equipped with the 3.0L EcoDiesel engine.[4]

6.     In that recall, FCA admitted that the defect places vehicle owners and occupants, as well as those outside the vehicle, at risk of injury, and listed the percentage of affected vehicles as 100%.[5]

7.     Despite this recall, FCA has made a number of misrepresentations that has left owners and lessees with no meaningful recourse aside from parking their trucks permanently.

8.     First, when the recall was announced in October 2019, FCA told affected consumers that "the remedy for this condition is not currently available" but that the company was "making every effort to finalize the remedy as quickly as possible . . . ."[6] Customers were told they would be notified "when the remedy is available. Once you receive your follow-up notice, simply contact your . . . dealer right away to schedule a service appointment."[7] This created the expectation that a fix would arrive soon, that it would be available for all affected vehicles regardless of whether the defect had already resulted in a crack or not, and that FCA would contact customers when a remedy was available.

9.     Second, affected customers were advised in the interim to "monitor their coolant levels" and contact their dealers if the levels were "consistently low."[8] This created the impression that consumer monitoring would be adequate to mitigate the danger, and that if a

---

[4] See supra, footnote 2. https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-7573.PDF.
[5] *Id.*
[6] Ex. 4, Issued Interim Notification Letter, https://static.nhtsa.gov/odi/rcl/2019/RIONL-19V757-4940.pdf
[7] *Id.*
[8] *Id.*

customer made a dealership aware of low coolant levels, then contacting the dealership would enable the customer to obtain some remedy.

10.    Third, FCA later sent notices to certain owners and lessees letting them know a fix was available for their specific vehicle VIN. The notice indicated, "it is extremely important to take steps now to repair your vehicle to ensure the safety of your passengers."[9] This notice, in addition to suggesting that the earlier message that monitoring coolant levels would be sufficient was not correct, misrepresented to owners that a fix was available. However, despite these specific notifications to affected owners and lessees and FCA's announcement that a fix was available for the 2014–2015[10] and 2016[11] model years, it appears that affected owners and lessees are still routinely being denied a fix due to part unavailability.

11.    Fourth, FCA indicated that the EGR cooler is defective in 100% of vehicles as the defect lies in the cooler's propensity to crack.[12] FCA announced it would conduct a recall "on all affected vehicles to replace the EGR cooler with a new EGR cooler (part number 68483334AA) that is not susceptible to thermal fatigue."[13] FCA indicated the repair must also be made on all unsold vehicles before retail delivery.[14] Yet dealerships were advised that "part supply is extremely limited" and that, as a result, the EGR cooler should only be replaced "if the part has failed."[15]

12.    FCA seems to admit that it is making repair determinations based on the scarcity of available parts in this contradictory instruction to dealerships: "**An EGR Cooler should only**

---

[9] Ex. 5, Issued Owner Notification Letter, https://static.nhtsa.gov/odi/rcl/2019/RCONL-19V757-6556.pdf.
[10] Ex. 6, https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V757-1761.pdf#:~:text=Safety%20Recall%20VB1%20%E2%80%93Diesel%20EGR%20CoolerPage%202%20The,cause%20the%20cooler%20to%20crack%20internally%20over%20time.
[11] Ex. 7, https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V757-8953.pdf.
[12] See Ex. 2, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-7573.PDF.
[13] See Ex. 1.
[14] See Ex. 6.
[15] Ex. 8, https://static.nhtsa.gov/odi/rcl/2019/RCMN-19V757-0602.pdf.

**be replaced if the part has failed**. If the vehicle does not need any repairs and the customer is still concerned for their safety, please provide the customer with a loaner vehicle until such time that the remedy for the recall is available."[16]

13.     FCA concealed the defect, then led customers to believe a fix was at hand,[17] then told them a fix was available,[18] but FCA continued to turn away affected owners and lessees when they sought the fix.

14.     No Plaintiff or reasonable consumer would have purchased or leased these Class Vehicles and/or paid the price they paid had they known about the EGR cooler defect.

15.     FCA has a history of putting profits over safety. The company's failed EGR cooler recall comes only five years after FCA received a record civil penalty from the federal government related to its failure over several years to provide Early Warning Report data to NHTSA as required under the TREAD Act.[19]  That penalty was included in an amendment to a 2015 consent order NHTSA issued regarding FCA's administration of two dozen safety recalls, with total penalties from that investigation totaling $175 million.[20]

16.     At the time, FCA acknowledged its failures, declared its "resolve to improve our handling of recalls and re-establish the trust our consumers place in us," and took steps to research "obstacles that discourage consumers from responding to recall notices."[21] That statement is in conflict with FCA's current efforts surrounding the EGR recall.

---

[16] *Id.*
[17] See Ex. 4.
[18] *See* Ex. 5.
[19] Ex. 9, NHTSA press release, *U.S. DOT Fines Fiat Chrysler $70 million for Failure to Provide Early Warning Report Data to NHTSA* (Dec. 10, 2015), https://one.nhtsa.gov/About-NHTSA/Press-Releases/nhtsa_fca_penalty_12102015.
[20] *Id.*
[21] Ex. 10, https://media.fcanorthamerica.com/newsrelease.do?id=16862&mid=

17.     Customers are entitled to FCA's honesty. Customers should be told if no remedy is readily available and given a meaningful choice about what to do with their truck. Customers of all the affected models, who as of this date have not been provided with a fix, including those customers who have already experienced a catastrophic event as a result of FCA's deception, are also entitled to reimbursement for the many millions of dollars FCA fraudulently obtained from them, and to compensation for their actual losses.

18.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles as defined herein. Plaintiffs and the Class seek monetary damages, business reforms, and injunctive and other equitable relief for Defendant's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as alleged in this complaint. Plaintiffs and Class members are also entitled to a significant award of punitive or exemplary damages given that Defendant deliberately deceived Plaintiffs and Class members, disregarded their rights to make free and informed consumer choices, damaged them economically, and put them at real risk of physical harm or death.

## II. PARTIES

**A.     Plaintiffs**

**1.     Plaintiff Kwaterski Construction, Inc.**

19.     Plaintiff Kwaterski Construction, Inc. ("Plaintiff Kwaterski") is a custom homebuilder located in Green Bay, Wisconsin. On or about August 28, 2019, Plaintiff Kwaterski purchased a used 2016 Ram 1500 EcoDiesel (for the purpose of this subsection, the "Class Vehicle" or "Truck") for approximately $35,000 from Chrysler World in Abrams, Wisconsin. Plaintiff had the Class Vehicle registered in its home state of Wisconsin. At the time of purchase, the Class Vehicle had approximately 36,529 miles on it.

20.    Unknown to Plaintiff Kwaterski at the time Plaintiff Kwaterski purchased the Class Vehicle, it was equipped with an EGR cooler that was defective and did not function as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Class Vehicle with the EGR cooler defect caused Plaintiff Kwaterski out-of-pocket losses, diminished value of the Class Vehicle, and endangered the lives of drivers and occupants.

21.    Prior to purchasing the Class Vehicle, Plaintiff Kwaterski's president and founder, Mark Kwaterski ("Mr. Kwaterski"), reviewed the Monroney Label FCA placed on the window. The window sticker advertised the Class Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Mr. Kwaterski relied on the advertisements contained within the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed any defects.

22.    In approximately October or November 2019, Plaintiff Kwaterski received a recall notice from FCA indicating there was a recall on its 2016 Ram 1500 EcoDiesel, due to a faulty EGR cooler. That recall notice indicated that there was no remedy or fix for the defect at that time. The notice suggested that owners of Class Vehicles should monitor their vehicle coolant level and contact the dealership if it was low.

23.    On November 25, 2019, Plaintiff Kwaterski attempted to receive the EGR cooler recall fix at Chrysler World in Abrams, Wisconsin. However, Chrysler World was not able to fix the vehicle because it did not have the necessary replacement parts.[22]

---

[22] Ex. 11, Chrysler World service record showing "no available parts" for the EGR Cooler safety recall, dated Nov. 25, 2020.

24.    On July 25, 2020, Plaintiff Kwaterski's Vehicle was traveling westbound on Interstate 94. Without warning, smoke began to fill the cabin, and the vehicle lost all power. Knowing that the vehicle would not make it to the right-hand shoulder, the vehicle was forced to the left-hand shoulder of the interstate. All five occupants, including four young children, were able to exit the vehicle before several explosions occurred. The entire vehicle became engulfed in flames. Police and Firefighters arrived shortly thereafter.



90996535.1





8

25.     On July 27, 2020, Mr. Kwaterski visited Chrysler World to inquire about the recall and notify them of the fire. During that visit, a Chrysler World employee told Mr. Kwaterski that they could only fix one EGR cooler per week, and that Plaintiff Kwaterski's vehicle was currently number twenty on the wait list. Meaning at best, Plaintiff Kwaterski's vehicle would not have been able to receive the fix until the second week of December 2020.

26.     At the time of the fire, Plaintiff Kwaterski's Class Vehicle had approximately 74,000 miles on it.

27.     Due to the loss of its truck, Plaintiff Kwaterski was forced to scramble to find a replacement truck fit for use by a custom home construction company.

28.     Prior to purchasing the Class Vehicle, Mr. Kwaterski had been looking for an automobile that was safe, durable, and reliable. In contemplating the Plaintiff's needs, including the need to purchase a vehicle fit for use by a custom home construction company, Mr. Kwaterski saw and recalled FCA's television commercials and discussions with Chrysler World employees regarding the Class Vehicles enhanced durability compared to other comparable vehicles on the market. On the date Mr. Kwaterski purchased the Class Vehicle for Plaintiff Kwaterski, he reasonably relied on the representations by FCA that the Class Vehicle was durable, reliable, and free from defect. Absent these representations, Plaintiff Kwaterski would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Mr. Kwaterski contained any disclosure that the Truck had a defective EGR cooler that could cause an engine fire. Had FCA made this disclosure, Mr. Kwaterski would have received this disclosure through his research, and would not have purchased the Truck or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle

received by Plaintiff. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### 2.    Plaintiff Dennis Anderson

29.    Plaintiff Dennis Anderson is a citizen of the State of Wisconsin, and resides in Stoughton, Wisconsin. On or about March 2018, Plaintiff Anderson purchased a new 2017 Ram 1500 EcoDiesel truck for approximately $38,000 from the Van Horn Chrysler Dodge Jeep Ram dealership in Stoughton, Wisconsin. Plaintiff Anderson had the Class Vehicle registered in his home state of Wisconsin, where it is currently registered. Plaintiff Anderson received the standard vehicle warranty at the time of purchase.

30.    In approximately November 2019, Plaintiff Anderson received a recall notice from FCA regarding the defective EGR cooler. That recall notice indicated that there was a fix available for his vehicle.

31.    In approximately May 2020 Plaintiff Anderson visited the Von Horn dealership to obtain the recall fix for the defective EGR cooler. At that visit, Plaintiff Anderson was told that the EGR cooler recall part was not available. To date, Plaintiff Anderson has not been contacted by the dealership to receive the fix.

32.    Unknown to Plaintiff Anderson at the time Plaintiff purchased the Class Vehicle, it was equipped with an EGR cooler that was defective and did not function as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Class Vehicle with the EGR cooler defect caused Plaintiff Anderson out-of-pocket losses, diminished value of the Class Vehicle, and endangered his life and the lives of his children.

33.    Plaintiff Anderson feels unsafe driving his class vehicle due to the fire hazard.

34.     Prior to purchasing the Class Vehicle, Plaintiff Anderson had been looking for an automobile that was safe, durable, and reliable. Plaintiff Anderson saw and recalled FCA's television commercials and discussions with Van Horn employees regarding the Class Vehicle's enhanced durability compared to other comparable vehicles on the market, and reviewed the Monroney label FCA placed on the window. The Monroney label advertised the Class Vehicle's various features, including price, specifications, gas mileage, equipment and warranty details, and crash test ratings. The Monroney label did not disclose that the Class Vehicle possessed any defects.

35.     Plaintiff Anderson reasonably relied on the representations by FCA that the Class Vehicle was durable, reliable, and free from defect. Plaintiff Anderson, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff Anderson contained any disclosure that the Class Vehicle had a defective EGR cooler that could cause an engine fire. Had FCA made this disclosure, Plaintiff Anderson would have received this disclosure through his research, and would not have purchased the Class Vehicle or would have paid less for it.

36.     There is a substantial difference in the market value of the vehicle promised by FCA and the market value of the vehicle received by Plaintiff Anderson. Plaintiff Anderson did not receive the benefit of the bargain, but received less than what was bargained for.

**B.    Defendant**

37.     Defendant FCA US LLC ("FCA") is a Delaware limited liability company. Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time Chrysler Group LLC became a wholly

11

owned indirect subsidiary of Fiat and was renamed FCA US LLC. FCA's principal place of

business and headquarters is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

38.    FCA, through its various entities, designs, manufactures, markets, distributes,

sells, and leases FCA automobiles in this District and multiple other locations in the United

States under the Dodge, Jeep, Chrysler, and Fiat brand names. FCA, and/or its agents and

subsidiaries, designed, manufactured, distributed, offered for sale, sold, and installed the engine

systems in the Class Vehicles. FCA also developed and disseminated the materially

misrepresentative owners' manuals, warranty booklets, product brochures, advertisements, and

other intentionally unreasonable and deceptive promotional materials relating to the Class

Vehicles, with the intent that such documents be purposely distributed throughout all 50 states.

FCA is engaged in interstate commerce, marketing, selling, and leasing vehicles through its

network in every state of the United States.

39.    FCA-authorized automobile dealerships act as FCA's agents in selling

automobiles under the FCA name and disseminating vehicle information provided by FCA to

customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs

and warranty issues because they performed repairs, replacements, and adjustments covered by

FCA's manufacturer warranty pursuant to the contracts between FCA and its 2,000+ authorized

dealerships nationwide.

### III. JURISDICTION AND VENUE

40.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this class

action alleges a claim under the Magnuson-Moss Warranty Act, the amount in controversy is

equal to or exceeds $50,000, exclusive of interest and costs, there are more than 100 class

members, and the amount-in-controversy of any individual claim exceeds $25. 15 U.S.C. § 2310(d)(3)(B).

41.    This Court also has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount-in-controversy exceeds $5,000,000, exclusive of interests and costs, and at least one class member is a citizen of a state different from Defendant.

42.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

43.    This Court has personal jurisdiction over FCA by virtue of FCA transacting and doing business in this District and because FCA is registered to do business in Wisconsin. FCA has transacted and done business in the State of Wisconsin and in this District and has engaged in statutory violations and common law tortious conduct in Wisconsin and in this District.

44.    Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because FCA transacts affairs in this District, and the ends of justice require it.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.**    **The Class Vehicles Contain EcoDiesel Engines Equipped With a Defective EGR Cooler**

45.    For purposes of this complaint, the "Class Vehicles" consist of the 2014–2019 model years of the Dodge Ram 1500 pick-up trucks and the 1500 Classic trucks manufactured by FCA and equipped with a 3.0L EcoDiesel engine. All vehicles falling under this Class Vehicle group were manufactured with the defective EGR cooler and FCA has not provided a fix for a significant number of these vehicles.

13

**B.    FCA Profits From the Popularity of EcoDiesel Vehicles**

46.    Diesel pickup trucks are extremely popular in certain U.S. market segments because of their reliability, power, and fuel efficiency. Diesel engines produce higher torque, even at low revolutions per minute ("RPM").

47.    The 3.0L EcoDiesel engine was developed by VM Motori, an Italian diesel engine manufacturer that has been owned by FCA since 2013.

48.    FCA engaged in an all-out effort to market the Class Vehicles, and to communicate the purported benefits of the EcoDiesel engine to consumers. These communications included, among other things: (1) press releases aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Class Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere; (4) information and interactive features on FCA's websites and blogs; and (5) print and television marketing.

49.    FCA's communications to consumers included representations regarding the durability and reliability of the EcoDiesel engine. In 2014 FCA publicized the "Aptly branded EcoDiesel, the 3.0-liter powerplant is a turbocharged 60-degree, dual overhead camshaft (DOHC) 24-valve V-6 that produces 240 horsepower and 420 lb.-ft. of torque is more efficient than all V-6 gasoline engines in the half-ton category. This abundant torque from a 3.0-liter engine is the enabler for 9,200 pounds of towing capacity while delivering fuel economy of 28 mpg on the highway."[23]

50.    These representations were made to consumers and the media, with the intent to create substantial interest in the EcoDiesel vehicles. Plaintiffs and Class Members were exposed

---

[23] Ex. 12, https://media.fcanorthamerica.com/newsrelease.do?id=15880&mid=69.

to these representations. The representations were false and deceptive because the vehicles contained a defective part and the vehicles were not durable or reliable, and could not perform as represented due to the risk of fire.

**C.**     **The EGR Cooler is Unreasonably Fragile**

51.     Since 2002, diesel engines have utilized cooled exhaust gas recirculation (EGR) to support meeting United States federal nitrogen oxide emission standards.[24]

52.     The EGR system works by recirculating a portion of an engine's exhaust gas back to the engine cylinders.[25]  This dilutes the oxygen in the incoming air stream and provides gases inert to combustion to act as absorbents of combustion heat to reduce peak in-cylinder temperatures.[26] A key component of the EGR system is the EGR cooler. This component is used to lower the temperature of the exhaust gases that are recirculated by the EGR system.[27] The EGR cooler is regularly subject to high heat.



Image: EGR cooler
Credit: Valeo

---

[24] Ex. 13, Billy G. Holland, et al., Modeling Approach to Estimate EGR Cooler Thermal Fatigue Life, 8 SAE INT'L J. ENGINES 1724–1732 (2015), retrieved from http://www.jstor.org/stable/26278069.
[25] Ex. 14, https://en.wikipedia.org/wiki/Exhaust_gas_recirculation.
[26] *Id.*
[27] Ex. 15, https://x-engineer.org/automotive-engineering/internal-combustion-engines/ice-components-systems/exhaust-gas-recirculation-egr-complete-guide-components/.

15

53.     FCA's EGR cooler is unreasonably fragile in design as it is subject to cracking due to thermal fatigue. This cracking is catastrophic as it can introduce pre-heated vaporized coolant into the vehicle's EGR system while the engine is running. This can result in combustion within the intake manifold, which may lead to a vehicle fire.

54.     The Class Vehicles are unfit for their ordinary use in that they cannot safely and reliably provide transportation and require customers to pay tens of thousands of dollars for a vehicle that is at risk of catastrophic engine fires that can destroy the vehicles and put people in harm's way.

**D.     FCA Knew That the EGR Cooler was Susceptible to Cracking**

55.     The Class Vehicles contain a defective EGR cooler. The EGR cooler is an internal component part in the Class Vehicles. Plaintiffs and Class members did not have reason to know at the time of purchase until at least October or November 2019 when FCA announced the recall that this hidden component was dangerously defective.

56.     However, FCA knew these Class Vehicles contained an unreasonable risk of engine fire.

57.     By design, EGR coolers are parts that are put under tremendous pressure from heat and need to reliably manage thermal loads.[28]

58.     As early as 2014, if not sooner, FCA was aware that the top concern when designing EGR coolers was thermal fatigue. Thermal fatigue can cause an EGR cooler to crack and lose coolant and/or result in the engine overheating. FCA was aware of this issue because owners and lessees had presented Class Vehicles to it for fixes due to cracked EGR coolers and fires.

---

[28] *See* Ex. 13, Holland, *et al.*, *supra* n.24, at 1724.

90996535.1

59.     Thermal fatigue design issues in EGR coolers were well-known within the automobile industry and cracks had developed in other FCA cars. FCA was also aware of complaints on Ram forum blogs, which FCA monitors, and another manufacturer had announced a recall due to a similar issue.

60.     A February 2014 article in www.truckinginfo.com entitled "Stay Ahead of Trouble on EGR Engines" described thermal fatigue as a cause of leaking in EGR coolers, "induced by the expansion and contraction of the components as the hot exhaust gas flowed through the cooler."[29]  The article also point out that a leak might not be visible externally and coolant consumption should be monitored: "If they find they are adding, say, half a gallon of coolant per week, but there are no external leaks, that's a good indication of an EGR cooler with an internal leak."[30]

61.     A July 2014 journal article entitled "A Numerical Study on the Thermal and Strain Characteristics of EGR Cooler" noted that "corrosion resistant material" should be considered to improve the performance of EGR coolers and that "the thermal stress produced by the temperature difference between exhaust gas and coolant" is a "highly important factor from the point of safety operation."[31] The article included figures illustrating thermal strain within the EGR cooler, including a photo of an actual crack on the inlet header in an EGR cooler.[32] Experiments showed that "there is a high possibility of the cracks appearance on the left down side of the header due to the thermal shock effects. CFD result in fig.11 also proves that the

---

[29] Ex. 16, Jim Park, *Stay Ahead of Trouble on EGR Engines*,
TRUCKINGINFO.COM (Feb. 11, 2014), https://www.truckinginfo.com/154878/stay-ahead-of-trouble-on-egr-engines.
[30] *Id.*
[31] Ex. 17, Vashani, et al., A Numerical study on the Thermal and Strain Characteristics of EGR Cooler, International Journal of Control and Automation, July 2014,
https://www.researchgate.net/publication/276840245_A_Numerical_Study_on_the_Thermal_and_Strain_Characteristics_of_EGR_Cooler.
[32] *Id.*

mentioned area is at a high risk of thermal strain due to the higher temperature difference and lower mass flow rate."[33] The article identified unequal flow and concentration of flow in the EGR cooler as a source of strain and discussed how CFD simulations could help predict crack locations and identify designs that would reduce the possibility of cracks.[34]

62.     A 2015 industry paper authored by FCA's 25-year partner on Ram trucks, Cummins, entitled "Modeling Approach to Estimate EGR Cooler Thermal Fatigue Life" identified thermal fatigue as a "top concern" in EGR cooler design.[35]  The authors described a "typical thermal fatigue crack" in an EGR cooler. The crack starts on the "inside diameter of a given tube and propagates through the header plate to another tube."



63.     The authors noted that due to the risk of "progressive damage" to the engine, including the turbocharger and exhaust aftertreatment devices, "the ability to estimate EGR cooler thermal fatigue prior to production launch is essential so that engine reliability and customer requirements are met."[36]

64.     This paper tested five EGR coolers to failure, analyzed multiple specific EGR cooler thermal fatigue field failures, and presented a model for estimating EGR cooler thermal

---

[33] *Id.*
[34] *Id.*
[35] *See* Ex. 13, Holland, *et al.*, *supra* n.24, at 1724.
[36] *Id.* at 1731.

fatigue life.[37]  Like the authors of the 2014 conference paper, the authors concluded that thermal stress could concentrate at the inlet header. "With EGR cooler gas inlet temperatures in excess of 650˚C and the cyclic nature of EGR flow based on the duty cycle, thermal fatigue at the gas inlet header is a concern."[38]

65.    In 2015, another automobile manufacturer acknowledged its EGR coolers were prone to cracking. The service notice for Behr/HELLA KGaA Hueck & Co. Lippstadt's 2009 Opel Insignia vehicle noted: "Loss of coolant at the EGR cooler. The above vehicles can experience a loss of coolant near the exhaust gas recirculation (EGR cooler). When examining the cooling system, special attention should be paid to the housing of the EGR cooler. A crack can form that leads to a loss of coolant."[39]

66.    An April 8, 2016 white paper titled "Characterizing Diesel Particulate Filter Failure During Commercial Fleet Use Due to Pinholes, Melting, Cracking and Fouling" published in "Emission Control Science and Technology" describes and provides photographs of EGR coolant leaks that resulted in coolant leaks and ash particles that could contribute to exhaust system corrosion.[40]

67.    FCA was also aware since at least 2016 of vehicles leaking coolant and cracked EGR coolers presented to its dealerships for service. For example, a customer posted online in a Dodge Ram forum on May 31, 2016: "Okay guys, I need some help! Cracked EGR Cooler,

---

[37] *Id*. at 1730-1731.
[38] *Id.* at 1724.
[39] Ex. 18, HELLA KGaA, Hueck & Co., Bulletin (2015), https://www.techtips.ie/Hella-Ireland/opel-insignia---loss-of-coolant-at-egr-cooler.pdf.
[40] Ex. 19, Kun Yang, Characterizing Diesel Particulate Filter Failure During Commercial Fleet Use due to Pinholes, Melting, Cracking and Fouling, 2 EMISSION CONTROL SCI. & TECH. (Apr. 8, 2016), https://link.springer.com/article/10.1007/s40825-016-0036-0.

dealer wants 3000+tax to replace (out of basic warranty, and my extended doesn't cover it) . . . ."[41]

68.     The issue was also common in online forums and discussions about FCA vehicles, which are monitored by FCA. For example, in June 2016, an owner of a 2014 Ram 1500 Longhorn posted in a Dodge Ram forum: "No evidence of any leaks, coolant smell, etc., but truck lost a significant amount of coolant that dealer can't explain where it went."[42]

69.     A complaint dated May 22, 2017, in an online Dodge EcoDiesel Ram forum stated: "I really like my Eco but just got out of the dealer from having an overheating problem. Long story-short, the EGR cooler was leaking internally and had to be replaced. Coolant was being burned off so no external leak was present. At first the engine did not even show a code, so they replaced the thermostat. That lead [sic] to overheating again and this time a code appeared. Hope that is the end of it[.]"[43]  This complainant's vehicle had just 35,900 miles on it.[44]

70.     Another post in a Dodge Ram forum shows that FCA's dealers were diagnosing vehicles with  faulty EGR coolers by 2017, and that the parts used at the time to replace the EGR cooler were on a "national back order":

> "While waiting for the dealer appointment we went on a 2,000 mile road trip. During the trip we had to add about half a gallon of Mopar coolant every 500 miles. Today was our date with the dealer. After pressure testing the system and not observing any external leaks, the dealer concluded that it must be a faulty EGR cooler. Unfortunately, the replacement EGR cooler is on a national back order at Chrysler. So, they sent us home and told us they will call us when the EGR becomes available. How long and how much can I continue driving the truck with a leaking EGR cooler (just topping off the tank every 500 miles)? Can that ruin anything in the engine? Can it leave be

---

[41] Ex. 20, Carmichael05, Post #1 on Cracked EGR Cooler, RAM1500DIESEL.COM (May 31, 2016), https://www.ram1500diesel.com/threads/cracked-egr-cooler.11744/.
[42] Ex. 21, Hershey1, Post #1 on Losing Coolant, June 20, 2016,
https://www.carcomplaints.com/Ram/1500/2014/cooling_system/loosing_coolant.s_html.
[43] Ex. 22, KWC, Post #1 on EGR Cooler leaking, ECODIESELRAM.COM (May 22, 2017),
https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.
[44] *Id*. at Post #4.

[sic] stranded in the middle of nowhere (we are planning another road trip)?"[45]

71.     Another Dodge Ram forum complaint from September 2017 states, "We just had our leaking EGR cooler replaced under warranty. Only 22000 miles on the engine. I hope this is the only problem we have. I really love this truck."[46]

72.     Another Dodge Ram forum complaint states "Glad to hear they are supporting you. I have a 2015 with the same 100,000 coverage but they said it's not covered under powertrain. No rental, loaner or help paying the $3100 charge to replace EGR and EGR cooler."[47]

73.     Since at least 2016, FCA knew about smoke and fire caused by EGR cooler failure.

74.     A June 2016 complaint to NHTSA indicated a 2014 Ram 1500 experienced a catastrophic failure and visible black smoke:

> **NHTSA ID Number: 10874286**
>
> Incident Date June 5, 2016
>
> Location: Simpsonville, SC
>
> Vehicle Identification Number 1C6RR6LM7ES****
>
> CATASTROPHIC EXHAUST GAS RECORD VALVE (EGR) AND EGR COOLER FAILURES WHICH RESULTED IN PLASTIC INTAKE MANIFOLD FAILURE. EGR COOLER SEVERELY PLUGGED WITH SOOT/CARBON WELL BELOW MILEAGE PERIOD OF FEDERAL EMISSIONS WARRANTY. NO SPECIFIED SERVICE REQUIREMENTS FOR THIS EGR SYSTEM. DAMAGE RESULTED IN SUBSTANTIAL LOSS OF POWER, UNABLE TO MAINTAIN

---

[45] Ex. 23, TzarIgor, Post #112 on Are you slowly loosing coolant?, RAM1500DIESEL.COM (June 26, 2017), https://www.ram1500diesel.com/threads/are-you-slowly-loosing-coolant-possible-egr-cooler-leak.8287/page-6.
[46] *See* Ex. 22, bullet317, Post #14 on EGR Cooler leaking, ECODIESELRAM.COM (Sept. 19, 2017), https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.
[47] See Ex. 22, Apks, Post #19 on EGR Cooler leaking, ECODIESELRAM.COM (Oct. 17, 2017), https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.

MINIMUM SPEED ON INTERSTATE 85 WHEN INTAKE
MANIFOLD FAILURE OCCURRED. VISIBLE BLACK
SMOKE/SOOT WAS BEING EMITTED FROM EXHAUST
UNDER ACCELERATION DURING THIS FAILURE,
CLEARLY NOT IN COMPLIANCE WITH EMISSIONS
STANDARDS.

75.     A June 2018 complaint to NHTSA indicated an FCA dealership diagnosed an

EGR system failure as the cause of a fire in a 2014 Ram 1500 truck:

**NHTSA ID Number: 11099511**

Incident Date June 1, 2018

Consumer Location JEFFERSON CITY, MO Vehicle
Identification Number 1C6RR7VM1ES****

TL* THE CONTACT OWNS A 2014 RAM 1500. WHILE
DRIVING AT AN UNKNOWN SPEED, SMOKE AND FLAMES
APPEARED FROM THE ENGINE COMPARTMENT. A
POLICE REPORT WAS NOT FILED AND NO INJURIES
WERE SUSTAINED. THE FLAMES WERE EXTINGUISHED
AND THE VEHICLE WAS TOWED TO CAPITOL CHRYSLER
DODGE JEEP RAM (3201 MISSOURI BLVD, JEFFERSON
CITY, MO 65109, (573) 893-5000) WHERE IT WAS
DIAGNOSED THAT THE EXHAUST GAS RECIRCULATION
SYSTEM FAILED, AND THE WIRING HARNESS AND
INTAKE AND EXHAUST MANIFOLDS NEEDED TO BE
REPLACED. THE MANUFACTURER WAS CONTACTED
AND DID NOT ASSIST. THE FAILURE MILEAGE WAS
74,000.

76.     An owner of a 2014 Ram EcoDiesel posted in 2018 about his February 2017 truck

fire: "I bought a Ram 1500 EcoDiesel 2014 last January. The engine caught fire while i [sic] was

pulling a RV on the I95. By the time we put out the fire too much damage was done and the

truck was scrapped by the Insurance. The fire started at the rear top of the engine on passenger

side and quickly spread to the driver side. We have no clue as to what caused that." He later

posted that he suspected the cause was leaking antifreeze or leaking fuel, and had noticed a liquid leaking from the intake manifold.[48]

77.    An owner of a 2016 Ram 1500 Tradesman posted on an online forum of a fire approximately one year after the unspecified date of purchase: "Our 2016 Ram 1500 Tradesman just caught on fire while driving it. Chrysler/Ram investigated and said it was no fault of theirs. The truck was one year old with 17,500 miles on it. Started under hood front left side. Was gone in 10 minutes. We had just had it completely checked, oil change, etc. for a trip we were taking. Chrysler won't do a thing!"[49]

78.    FCA was also aware of the issue due to BMW's EGR cooler recall in 2018. Similar to FCA's eventual recall, BMW's recall was based on the admission that cooling fluid could leak and melt the intake manifold, increasing the risk of a fire.[50] An investigative team of 32 experts discovered that faulty EGR valves were the cause of engine fire, BMW admitted to the fire risk, and was fined for its belated recall and alleged attempts to conceal the defect.[51]

**E.    FCA's Investigation and Recall**

79.    Despite FCA's knowledge as early as 2014 of the propensity of its EGR coolers to crack due to thermal fatigue, and the need to implement design features to mitigate this risk, FCA's Vehicle Safety and Regulatory Compliance ("VSRC") organization did not open an investigation into the issue until May 22, 2019.[52]

---

[48] Ex. 24 https://www.cargurus.com/Cars/Discussion-c10415_ds519785.
[49] Id.
[50] Ex. 25, May 2019 BMW owner notification letter, https://static.nhtsa.gov/odi/rcl/2018/RCONL-18V755-1720.pdf.
[51] Ex. 26, https://www.koreatimes.co.kr/www/tech/2019/01/419_260887.html.
[52] Ex. 27, FCA US LLC Chronology, 2014-2019 Ram 1500 Eco Diesel Engine Compartment (submitted Oct. 24, 2019), https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V757-6098.pdf.

80.     FCA was aware of engine compartment fires in Ram 1500 3.0L Eco Diesel trucks by the time of the investigation.[53]

81.     Between May 24, 2019 and June 2019, FCA "reviewed all Ram 1500 3.0L Eco Diesel fires reported to FCA US, and determined that a number of the fires originated in the general vicinity of the center of the engine compartment."[54]

82.     The vehicles examined by FCA showed holes in the intake manifold.[55]

83.     By October 11, 2019, FCA was aware of injuries relating to EGR cooler failures, and was aware of 61 field reports related to EGR cooler failure, 1,289 CAIRs, and a total of 8,909 EGR cooler warranty replacements reports.[56]

84.     In October 2019, FCA finally admitted through its recall that its EGR cooler was susceptible to thermal fatigue.[57]

85.     FCA also admitted, "[t]hermal fatigue may cause the cooler to crack internally over time."[58]

86.     On October 25, 2019, FCA also admitted that the EGR cooler can crack and cause a fire: "FCA US uses dealer-service reports and other data streams to monitor the performance of its vehicles in the field. Such reports prompted an internal investigation that discovered microscopic cracks in some Exhaust Gas Recirculation (EGR) coolers. If these microscopic cracks are present, coolant may escape and – in rare circumstances – pose an engine fire risk."[59]

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *See* Ex. 2.
[58] *Id.*
[59] Ex. 28, FCA Press Release, Statement: EGR Cooler (Oct. 25, 2019), https://media.fcanorthamerica.com/newsrelease.do?id=21315&mid=1.

87.     FCA also admitted, "[a] vehicle fire may increase the risk of injury to occupants and persons outside of the vehicle, as well as property damage."[60]

## F.    FCA's Subsequent Failure to Act

88.     At the time of the recall, FCA represented that all affected vehicle owners would have the EGR cooler replaced with a new EGR cooler that is not susceptible to thermal fatigue.[61]

89.     Although some impacted owners have received a fix, inexplicably, almost a year after FCA announced the recall, a significant portion of owners of affected vehicles are stuck with unsafe vehicles due to FCA's failure to act on its recall. Owners cannot receive the fix, nor return their trucks to FCA, leaving owners with no recourse.

90.     FCA notified dealerships that a fix is available for the 2014–2016 model years and notified owners that "it is extremely important to take steps now to repair your vehicle to ensure the safety of you and your passengers."[62] Yet FCA routinely tells owners of these model years that a fix is not available:

> **NHTSA ID Number: 11331819**
>
> Incident Date June 30, 2020
>
> Consumer Location HARLINGEN, TX
>
> Vehicle Identification Number 1C6RR6LM7GS****

---

[60] *See* Ex. 2.

[61] *See* Ex. 1.

[62] See Ex. 29, FCA Dealer Service Instruction "Revision 1 May 2020" (indicating remedy is available for 2014-2015 models), and Ex. 7, FCA Dealer Service Instruction "Revised May 2020" (adding 2016 model year as a year the remedy is available for), and Ex. 30, Amendment 5 to FCA's Part 573 Safety Recall Report dated April 2, 2020, introduced a phased final mailing campaign for the 2016–2019 model years for Phase 2 – 2016 model years (or before May 7, 2020) and for Phase 3 – 2017–2019 model years (or about May 28, 2020) (available at https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-6689.PDF), and Ex. 31, Amendment 6 to FCA's Part 573 Safety Recall Report dated April 21, 2020 (available at https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-6689.PDF), changed the timeframe: Phase 2 for the 2016 model year would start on or about May 28, 2020) and Phase 3 for the 2017–2019 model years would start on or about June 18, 2020) (available at https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-6689.PDF), and Ex. 32 Amendment 7, dated June 11, 2020 (available at https:// static. nhtsa. gov/odi/rcl/2019/RCLRPT-19V757-7169.PDF), reset the timing to the Amendment 5 deadlines.

TL* THE CONTACT OWNS A 2016 RAM 1500. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 19V757000 (ENGINE AND ENGINE COOLING) HOWEVER, THE PART TO DO THE RECALL REPAIR WAS UNAVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. BERT OGDEN CHRYSLER DODGE JEEP RAM (8421 W. EXPY 83, HARLINGEN, TX 78552, (956) 335-3018) WAS CONTACTED AND CONFIRMED THAT PARTS WERE NOT AVAILABLE FOR THE RECALL REPAIR. THE MANUFACTURER WAS NOT NOTIFIED OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

**NHTSA ID Number: 11330406**

Incident Date June 22, 2020 Consumer Location SAN JOSE, CA

Vehicle Identification Number 3C6JR7DM3EG****

RECEIVED RECALL NOTICE VB1 TO REPLACE EGR COOLER THAT MAY CAUSE ENGINE FIRE. THE RECALL SAYS THAT PARTS ARE AVAILABLE. I CONTACTED 2 DEALER AND HAD CHAT WITH FCA DIRECTLY. ALL OF THEM TOLD ME THAT PARTS ARE NOT AVAILABLE. NEITHER DEALER WOULD GIVE ME AN APPOINTMENT DATE AND SAID THAT THERE WERE MANY AHEAD OF ME. FCA SAID THAT PARTS ARE ALLOCATED AT 1 SET OF PARTS PER DEALER PER WEEK. THE BOTTOM LINE IS THAT THESE TRUCKS ARE AT RISK FOR FIRE THAT COULD RESULT IN INJURY, BUT FCA IS NOT RESPONSIVE BY THE FACT THAT THE PARTS ARE NOT AVAILABLE.

**NHTSA ID Number: 11329574**

Incident Date May 1, 2020

Consumer Location SYLACAUGA, AL

Vehicle Identification Number 1C6RR7PM9GS****

TL* THE CONTACT OWNS A 2016 RAM 1500. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 19V757000 (ENGINE AND ENGINE COOLING) HOWEVER, THE PART TO DO THE RECALL REPAIR WAS UNAVAILABLE. THE CONTACT CALLED TO

26

MCSWEENEY CHRYSLER DODGE JEEP RAM (2605 DR
JOHN HAYNES DR, PELL CITY, AL 35125; (205) 813-7020)
WHERE IT WAS CONFIRMED THAT THE PART WAS NOT
AVAILABLE. THE CONTACT STATED THAT THE
MANUFACTURER EXCEEDED A REASONABLE AMOUNT
OF TIME FOR THE RECALL REPAIR. THE
MANUFACTURER HAD NOT BEEN MADE AWARE OF THE
ISSUE. THE CONTACT HAD NOT EXPERIENCED A
FAILURE. PARTS DISTRIBUTION DISCONNECT.

**NHTSA ID Number: 11340956**

Incident Date October 24, 2019 Consumer Location SEQUIM,
WA

Vehicle Identification Number 1C6RR7NM5HS****

TL* THE CONTACT OWNS A 2017 RAM 1500. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 19V757000 (ENGINE AND ENGINE
COOLING). THE CONTACT CALLED THE WILDER
CHRYSLER JEEP DODGE RAM DEALER LOCATED AT 53
JETTA WAY, PORT ANGELES, WA 98362, AND IT WAS
CONFIRMED THAT THE PARTS WERE NOT YET
AVAILABLE. THE CONTACT STATED THAT THE
MANUFACTURER EXCEEDED A REASONABLE AMOUNT
OF TIME FOR THE RECALL REPAIR. THE
MANUFACTURER WAS MADE AWARE OF THE ISSUE.
THE CONTACT HAD NOT EXPERIENCED A FAILURE.
PARTS DISTRIBUTION DISCONNECT.

**NHTSA ID Number: 11340466**

Incident Date July 20, 2020 Consumer Location MURRAY, KY

Vehicle Identification Number 1C6RR7NM7HS****

TL* THE CONTACT OWNS A 2017 RAM 1500. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 19V757000 (ENGINE AND ENGINE
COOLING) HOWEVER, THE PART TO DO THE RECALL
REPAIR WAS UNAVAILABLE. THE CONTACT STATED
THAT THE MANUFACTURER EXCEEDED A REASONABLE
AMOUNT OF TIME FOR THE RECALL REPAIR. THE
DEALER DAVID TAYLOR CHRYSLER-DODGE-JEEP-RAM-
FIAT (2052 US-641, MURRAY, KY 42071) WAS CONTACTED
AND CONFIRMED THAT PARTS WERE NOT YET
AVAILABLE. THE MANUFACTURER WAS NOT MADE

27

AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

**NHTSA ID Number: 11338371**

Incident Date June 12, 2020 Consumer Location EAGLE, WI

Vehicle Identification Number 1C6RR7NM9HS****

TL* THE CONTACT OWNS 2017 RAM 1500. THE CONTACT RECEIVED RECALL NOTIFICATION FOR NHTSA CAMPAIGN NUMBER: 19V757000 (ENGINE AND ENGINE COOLING). HOWEVER, THE PARTS TO DO THE REPAIR WERE AVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. THE DEALER LYNCH CHEVROLET OF MUKWONAGO (280 E WOLF RUN, MUKWONAGO, WI 53149) WAS CONTACTED AND STATED THE PARTS WERE ON BACKORDER FOR THE RECALL REMEDY. THE MANUFACTURER WAS NOT NOTIFIED OF THE ISSUE. THE CONTACT STATED THAT SEVERAL MONTHS AFTER HE RECEIVED THE RECALL NOTIFICATION, THE VEHICLE STALLED WHILE DRIVING AT AN UNKNOWN SPEED. THE CONTACT WAS ABLE TO PULL TO THE SIDE OF THE ROAD AND TURN THE VEHICLE OFF. AN UPON OPENING THE HOOD THE CONTACT NOTICED FLAMES AROUND THE ENGINE CORDS AND WIRE. THE CONTACT STATED HE WAS ABLE TO EXTINGUISH THE FIRE HIMSELF WITH WATER. THE VEHICLE WAS TOWED TO LYNCH CHEVROLET OF MUKWONAGO FOR DIAGNOSTIC TESTING AND REPAIRS. THE FAILURE MILEAGE WAS APPROXIMATELY 58,000. PART DISTRIBUTION DISCONNECT.

91.    Another owner wrote in a Dodge Ram forum:

"I received a recall notice from fca stating that a faulty egr cooler can cause fires and is a safety concern. The recall also states that parts are available. I have contacted several Ram dealers and they all tell me that parts are on back order and that each dealer only gets one set of parts per week. I was also told that it may be as long as 6-8 months before my truck can be addressed. Mine is not an isolated incident. As a member of a Ram forum of 17K members, this is an [sic] frequent complaint. Since Ram knows that this is a safety issue that could cause a fire, they should be either repairing the vehicles

28

or providing loaner transportation until such time as the repair can be made."[63]

92.    Owners of the 2017–2019 model years have yet to be notified of an available fix.

## G.    The Class Vehicles are per se Defective Because the EGR Cooler Defect Poses an Inherent Safety Risk to Vehicle Occupant

93.    The Federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

94.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *See United States v. Gen. Motors Corp.,* 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five (5) days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c). Then, "within a reasonable time" after deciding that a safety issue exists, the

---

[63] Ex. 33, Owner in San Jose, CA, Post #187, https://www.carcomplaints. com/Ram/1500/2014/engine/engine.shtml.

manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a).

Violating these notification requirements can result in a maximum civil penalty of $15,000,000.

49 U.S.C. § 30165(a)(1).

95.    FCA undoubtedly saw numerous consumer complaints regarding the EGR cooler

failure, based on its duty to monitor safety-related complaints and concerns.

96.    FCA had notice of the EGR cooler defect through warranty repair requests,

replacement part sales, , NHTSA complaints, indirect complaints from customers through online

fora, other automobile makers, industry sources including articles and whitepapers, and testing

and investigations.

**H.    FCA Concealed the EGR Cooler Defect Affirmatively and via Omissions**

97.    Since 2014 through 2019, FCA extensively advertised the benefits of the

EcoDiesel engine. At all times relevant to this action, FCA omitted and/or concealed the EGR

cooler defect. At no point during the relevant time period to this action did FCA inform buyers

and/or lessees of the Class Vehicles that the EGR cooler could crack and lead to an engine fire.

FCA represented that the Class Vehicles were free from defect and advertised that they were

durable and reliable, but those representations were not true.

98.    FCA led consumers, including Plaintiffs and Class members, to believe that the

Class Vehicles would be free from defects that would result in loss of power and engine fire.

99.    FCA claimed that its 2014 Dodge Ram EcoDiesel vehicles were durable, touting

"[t]he 3.0-liter EcoDiesel V6 utilizes dual-filtration technology for greater . . . durability."[64]

---

[64] Ex. 34, 2014 Dodge Ram Commercial eBrochure, at 8, available at
https://www.ramtrucks.com/assets/pdf/brochures/14MY_Ram_Commercial_eBrochure.pdf.

100.     In its EcoDiesel advertising, FCA specifically targets consumers "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."[65]

101.     FCA claims that the EcoDiesel engine has best-in-class torque: "The EcoDiesel engine delivers best-in-class 420 lb-ft of torque. Paired with an impressive 240 horsepower, this engine has serious muscle."[66]

102.     Other online advertisements highlight the EcoDiesel's expected best-in-class torque, fuel efficiency, and range. "The new 3.0-liter V-6 EcoDiesel is among today's most advanced diesel engines. Its emissions that are 60 percent lower than those produced by diesel powertrains 25 years ago. The impressive combination of torque and fuel economy marks a new level of performance for small V-6 engines."[67]

## I.     FCA Routinely Denies Responsibility for Fixes by Denying Warranty Claims and by Denying Vehicle Fires are Caused by the EGR Cooler Defect

103.     FCA routinely denies warranty claims relating to leaking coolant and cracked hoses. One impacted owner described how his claim was denied even though his truck developed a visible split in the coolant hose at just 72,000 miles:

> I recently had my first major issue with my ecodiesel and felt like I should share it with you all. Maybe some of you have experienced the same thing. So at 72k miles my engine decided to spring a major coolant leak. I first noticed the leak when backing into my driveway, noticed a trail of water. I jumped out of my truck to investigate. Water was running from the back of the motor and down the trans bellhousing. By the time I shut the truck off there was almost no coolant left in the motor. I'm lucky it happened when it did. I spent a few hours trying to diagnose where the coolant was coming from.

---

[65] Ex. 35, The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You, RAM ZONE (Ram trucks blog operated by FCA US LLC) (July 16, 2013), available at https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.
[66] Id.
[67] Ex. 36, The 2014 Ram 1500 EcoDiesel, First of Its Kind Light-Duty Diesel Pickup, RAM ZONE (Ram trucks blog operated by FCA US LLC) (Feb. 14, 2013), available at https://blog.ramtrucks.com/features/the-2014-ram-1500-ecodiesel-first-of-its-kind-light-duty-diesel-pickup/index.html.

With no avail I chose to have to have it towed to the nearest dealer. It took the mech a few days to diagnose what failed and allowed me to come to the shop to check it out. As some of you may know there is a coolant line that is in the valley of the motor that comes from the drivers side head and feeds to the turbo or formally called the turbo water feed tube. This tube is made up of two hard lines that are connected by a rubber heater hose. The heater hose split! To access this absolutely terrible engineering design the intake manifold had to be removed. Now why would they put a standard heater hose in one of the most hottest parts of the motor? I understand they need flex but they could have used something of better quality, maybe something that could withstand heat better like a silicon hose or designed the hose to run on the outside of the motor.[68]

104.    The owner described FCA as useless: "I contacted fca directly, they were useless. they [sic] stated that since this part has rubber hose and 'rubber' items are only covered for 36k miles that I was sol on any warranty covering the repair." This owner was charged a total of $2,054.90 for the fix. This owner also complained that the needed part was not available.[69]

105.    Another owner whose 2015 Ram 1500 EcoDiesel caught on fire posted:

Last week (10/3/17) my 2015 Ecodiesel with 46k miles engine caught on fire. While driving and towing and empty equipment trailer at highway speed ( 55mph ) the engine began to make high pitched knocking noises, followed by partial power, and the truck started decelerating as the engine rpms dropped, then stalled. I re-started the truck and the idle seemed normal, no check engine lights displayed, I was wondering if it was a fuel filter issue causing a lean air/fuel mix or computer issue and began to drive again but quickly realized there was no power, and poor acceleration. The engine began to decrease speed and again stalled, but this time gray, then black smoke came into the cabin through the air vents, and black smoke started rolling out of the front grill and hood seams. Black smoke that smelled like burning diesel in addition to plastic. Quickly adding up the senses produced the fact that I had an engine compartment fire. I happened to have a good sized fire extinguisher in the trailer hitch tool box, without much delay in realizing car fires spread quick and not wanting a fire bomb on the US Route 20 bridge

---

[68] Ex. 37, Feb 19, 2018 post by CR128, https://www.ecodieselram.com/forum/threads/turbo-water-coolant-feed-tubefailure.1743/.
[69] *See* Ex. 37, Feb 20, 2018 post by CR128, https://www.ecodieselram.com/forum/threads/turbo-water-coolant-feed-tubefailure.1743/.

32

overpass to NYS Route 88, I opened the hood with pin pulled extinguisher in hand and noticed black smoke and flames coming directly from under the plastic cover at the center top of the engine (the one that covers up the fuel and injector lines). I was able to extinguish the fire in short order. Shaken up a little as this is a first for me, I called for a towing company to take the truck to the dealership. The dealership started to look at it the following morning, they were told to stop work repair until Chrysler could send an investigator.[70]

106.    The owner described FCA's failure to honor his warranty or take any

responsibility:

Monday 10/9/17 an investigator examined the truck. I received a letter today from "Mr. Kon" stating that the investigation result has led them to believe that the fire was not due to manufacturing responsibility. No additional details were offered or disclosed as to cause and would not be offered if requested as that information is proprietary. The truck is entirely stock, no modifications, and has been serviced regularly at the dealership where purchased. No assistance will be offered by Fiat Chrysler of any sort and this will not be covered by the warranty. The cost is on me. I lodged a complaint at several levels today. Chrysler could care less and offers no avenue for discussion. The dealership is shaking their heads in disbelief of the letter. No parts were taken for examination or study (melted wiring harness, melted fuel hoses/lines), without any detail provided, it appears the investigation was entirely superficial. The truth is I want to know why did this happen? It is not normal order to have an engine catch on fire. If there is a 3rd party cause, then what happened? There are many thousands of Ram 1500 Ecodiesel trucks driven daily, at this point I am led to believe each of us have a genuine risk of a fire under the hood above and beyond what is deemed acceptable. Statistically this could be a real rarity or it could be just the beginning and a matter of time for all of these trucks to catch fire. Fiat Chrysler will not pay to repair this engine fire despite still being well within the power train warranty time frame, Fiat Chrysler will not pay partial expense, will not offer to pay for something as simple as a loaner car till the repair is complete, they will not buy the burned vehicle back, they will not communicate any further on the matter. If by choice I will not purchase any FCA vehicle, and based on my experience- I would seriously question anyone in the public buying their product from Chrysler. An engine fire in a 2015 model year 46,000 mile diesel fueled truck under

---

[70] Ex. 38, EcoFire October 12, 2017 Post #1, https://www.ram1500diesel.com/threads/engine-fire-and-fc-says-not-responsible.45737/#post-679529.

warranty that will not be covered by the manufacturer is not normal.
Any other engine fires out there???[71]

## J.  FCA Also Misrepresented that Loaner Vehicles Would be Provided to Impacted Owners

107.    In addition to concealing the defect, denying warranty claims, claiming it was not at fault after fire investigators, and telling owners a fix was available when it was not, FCA also routinely denies some requests for loaner vehicles pending a fix, forcing impacted owners and lessees back on the road.

108.    FCA actively misrepresented that loaner vehicles would be provided for all concerned owners.

109.    In December 2019, FCA released an instruction stating, "if the vehicle does not currently need any repairs, and the customer is still concerned for their safety, please provide the customer with a loaner vehicle until such time that the remedy for the recall is available."[72]

110.    But loaner vehicles are not being provided:

> "My truck started leaking coolant out the rear of engine down transmission and on the ground and motor wouldn't hold any coolant in it so I called fca customer care and they told me vehicle is not driveable to get it to Ram dealership for repairs it's been sitting there 9 days now and I cant [sic] get anybody from dealer or customer care to get it worked on and diagnosed it's under factory warranty plus the EcoDiesel settlement extended warranty coverage for all parts of possible problem and they will not loan me a vehicle of any kind and I'm in need of my vehicle repaired and back to being able to drive it, I call Ram customer care every day and keep getting told nothing about it getting repaired or problem located."[73]

---

[71] *Id.*
[72] *See* Ex. 8.
[73] Ex. 39, Jan. 14, 2020, Owner of Dodge Ram 1500 with 98,215 miles, Lake City, FL, USA, Post #164, https://www.carcomplaints.com/Ram/1500/2014/engine/engine-2.shtml.

111.    Another affected owner posted in a Dodge Ram 1500 EcoDiesel forum that he

filed a NHTSA complaint and asked FCA for a rental car until the fix was available, and was

told "we can't authorize a rental car."[74]

**K.    FCA Continued to Sell Vehicles With the EGR Cooler Defect Even After Announcing the Recall**

112.    FCA continues to sell vehicles with this known issue:

"So, I just purchased a 2015 eco around 1 month ago from a dealer. Truck has 37,000 miles on it. I obviously have not received any recall letter for this large issue. What I've been reading on this thread, is the engine starts to loses power first? I have a 5 y/o who is still in a car seat, so I want to know the first sign. I contacted the dealer and they said they would contact me when parts are available for the recall. Does anyone know when parts are available? Also how can a Ram dealership sell a vehicle with this type of recall pending?"[75]

**L.    Plaintiffs and Class Members Reasonably Relied on FCA's Misrepresentations and Omissions of Material Fact**

113.    Although Plaintiffs and Class members considered other vehicles, Plaintiffs and

Class members decided to purchase their subject Class Vehicles because they reasonably relied

upon FCA's media marketing campaigns, and other forms of advertisement, which touted the

Class Vehicles as durable, reliable, and free from defect. These misrepresentations and

omissions, in combination with the representation and understanding that the vehicles would

retain all of their promised durability and performance throughout their useful life, and the

representation and understanding that the vehicles were free of defects and fit for its intended

use, induced Plaintiffs and Class members to purchase the Class Vehicles.

---

[74] Ex. 40, Post #119, December 24, 2019post by Bobcope399, https://www.ecodieselram.com/forum/threads/engine-fire.3227/page-6#post-27807.
[75] *See* Ex. 40, Post #112, Dec. 18, 2019 post by AndyIRV, https://www.ecodieselram.com/forum/threads/engine-fire.3227/page-6#post-27807.

114.    Unbeknownst to the named Plaintiffs and Class members, at the time they purchased their Class Vehicles, the Class Vehicles contained a dangerously defective EGR cooler. FCA never disclosed this defect to consumers. Therefore, their vehicles were not fit for ordinary use, or intended use, and could not deliver the advertised combination of safety, durability, and reliability that Plaintiffs reasonably relied upon. Plaintiffs and each Class Member suffered concrete injury as a direct and proximate result of FCA's conduct and would not have purchased the Class Vehicle and/or would have paid less for it, had FCA disclosed the defective nature of the Class Vehicles.

115.    Each named Plaintiff and/or Class member expected FCA, through its authorized dealers or through its advertising campaigns, to disclose material facts about the safety, durability, fuel economy, and longevity of its vehicles and the existence of any defect that will result in expensive, non-ordinary repairs and a potential safety hazard.

116.    Plaintiffs' and each Class member's ascertainable losses include, but are not limited to, out-of-pocket costs for repair necessitated by the defect (including catastrophic failure and replacement of component parts), payment of a higher price for the Class Vehicles compared to what they would have paid for non-defective vehicles, out-of-pocket losses suffered by overpaying for the vehicles at the time of purchase or lease, decreased performance of the vehicles, diminished value of the vehicles, and out-of-pocket costs.

117.    Plaintiffs did not receive the benefit of their bargain and bring claims individually and as representatives of the Class. Plaintiffs and each Class member expected that FCA, via its authorized dealers or through its advertising campaigns, would disclose material facts about the safety, durability, fuel economy, and longevity of its vehicles and the existence of any defect that will result in expensive, non-ordinary repairs and a potential safety hazard. FCA failed to do so.

36

**M.**    **Allegations Establishing Agency Relationship between FCA and FCA Dealerships**

118.    An agency relationship existed and exists between FCA and FCA dealerships. Upon information and belief, FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents. The dealers have accepted that undertaking. FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as demonstrated by the following:

    a.    FCA can terminate the relationship with its dealers at will.

    b.    The relationships are indefinite.

    c.    FCA is in the business of selling vehicles as are its dealers.

    d.    FCA provides tools and resources for FCA dealers to sell vehicles.

    e.    FCA supervises its dealers regularly.

    f.    Without FCA, the relevant FCA dealers would not exist.

    g.    FCA requires the following of its dealers:

        i.    Reporting of sales;

        ii.    Computer network connection with FCA;

        iii.    Training of dealers' sales and technical personnel;

        iv.    Use of FCA-supplied computer software;

        v.    Participation in FCA's training programs;

        vi.    Establishment and maintenance of service departments in FCA dealerships;

        vii.    Certification of FCA pre-owned vehicles;

        viii. Reporting to FCA with respect to the car delivery, including reporting customers' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date,

37

type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

    ix.  Displaying FCA logos on signs, literature, products, and brochures within FCA dealerships.

h.  Dealerships bind FCA with respect to:

    i.  Warranty repairs on the vehicles the dealers sell; and

    ii.  Issuing service contracts administered by FCA.

i.  FCA further exercises control over its dealers with respect to:

    i.  Financial incentives given to FCA dealer employees;

    ii.  Locations of dealers;

    iii.  Testing and certification of dealership personnel to ensure compliance with FCA's policies and procedures; and

    iv.  Customer satisfaction surveys, pursuant to which FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

j.  FCA dealers sell FCA vehicles on FCA's behalf, pursuant to a "floor plan," and FCA does not receive payment for its cars until the dealerships sell them.

k.  Dealerships bear FCA's brand names, use FCA's logos in advertising and on warranty repair orders, post FCA-brand signs for the public to see, and enjoy a franchise to sell FCA's products, including the Class Vehicles.

l.   FCA requires FCA dealers to follow the rules and policies of FCA in conducting all aspects of dealer business, including the delivery of FCA's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

m.   FCA requires its dealers to post FCA's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized FCA dealers and servicing outlets for FCA cars.

n.   FCA requires its dealers to use service and repair forms containing FCA's brand names and logos.

o.   FCA requires FCA dealers to perform FCA's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by FCA.

p.   FCA requires FCA dealers to use parts and tools either provided by FCA, or approved by FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of FCA's vehicles.

q.   FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA-brand vehicles.

r.   FCA audits FCA dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

90996535.1

s.    FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of FCA's vehicles.

t.    FCA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines and repair procedures to be followed for chronic defects.

u.    FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by FCA to consult when dealers are unable to correct a vehicle defect on their own.

v.    FCA requires FCA-brand vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

w.    FCA dealers are required to notify FCA whenever a car is sold or put into warranty service.

## V. CLASS ACTION ALLEGATIONS

**A.**    **<u>Class Definitions</u>**

119.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves, and all persons or entities in the state of Wisconsin who purchased or leased a Class Vehicle.

120.    Excluded from the Class are individuals who have personal injury claims resulting from the conduct and defect alleged herein; Defendant and its subsidiaries, affiliates, officers, and employees; Class Counsel and their employees; the Judge to whom this case is assigned and his or her immediate family; associated court staff assigned to this case; and all persons who timely elect to exclude themselves from the Class.

40

121.    Plaintiffs reserve the right to modify the definition of the Class prior to class certification.

122.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**B.    Class Certification Requirements**

123.    **Numerosity**: Rule 23(a)(1): There are an estimated hundred thousand Class Vehicles Nationwide. Individual joinder of all Class members is impracticable. The precise number of Class members may be ascertained from Defendant's records and vehicle registration records. Plaintiffs anticipate providing appropriate notice of this action to the Class members by Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and published notice.

124.    **Commonality and Predominance**: Rules 23(a)(2) and 23(b)(3): This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members. These include, but are not limited to, the following:

a.    Whether FCA engaged in the conduct alleged herein;

b.    Whether FCA knew about the EGR cooler defect and the inherent problems related thereto, and if so, how long FCA knew or should have known as much;

c.    Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce within the United States;

d.      Whether the diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e.      Whether FCA omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f.      Whether FCA designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate EGR cooler;

g.      Whether FCA's conduct violates Wisconsin's consumer protection statutes and constitutes breach of contract or warranty and fraudulent concealment as asserted herein;

h.      Whether Plaintiffs and the Class members overpaid for their vehicles at the point of sale or lease; and;

i.      Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, what amount.

125.    **Typicality**: Rule 23(a)(3): Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and each Class member purchased or leased a Class Vehicle and were similarly injured through Defendant's wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendant. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

126.    **Adequacy**: Rule 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Federal Rule of Civil Procedure

42

23(a)(4). Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor Plaintiffs' counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

127.    **Superiority**: Rule 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

128.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. EQUITABLE TOLLING

129.    As of the date of this complaint, FCA continues to market its vehicles based on superior durability and reliability, despite its knowledge that the Class Vehicles are defective, have catastrophically failed, or can catastrophically fail, and continues to represent that a remedy is readily available for the EGR cooler recall.

130.    The tolling doctrine was made for cases of concealment like this one. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the defect alleged and that such durability and performance is far less than FCA promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, their vehicles were unsafe, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications would impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and Class members. With respect to Class Vehicles that experienced a catastrophic EGR cooler crack prior to the recall, Plaintiffs and Class members did not discover and could not reasonably have discovered their EGR cooler failure. Even with respect to Class Vehicles that experienced a catastrophic EGR cooler crack after the recall, Plaintiffs and Class members did not discover and could not reasonably have known that FCA would not provide a fix for their EGR cooler failure. Therefore, all applicable statutes of limitation have been tolled by operation of the discovery rule.

131.    Until the announcement of the botched recall in October 2019, Plaintiffs and putative Class members had no way of knowing about FCA's wrongful and deceptive conduct with respect to their defective Class Vehicles. After the recall, FCA falsely represented that all EGR coolers would be replaced given that 100% were impacted by the recall, did not tell owners that only those that were cracked would be fixed, and did not tell owners that the parts needed for the fix would not be available for a significant segment of vehicle owners impacted by the recall.

## VII. CLAIMS FOR RELIEF

### COUNT I
### BREACH OF THE IMPLIED AND WRITTEN WARRANTY
### MAGNUSON – MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301, *et seq.*)

132.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

133.    Plaintiffs bring this count individually and on behalf of Class members.

134.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

135.    Plaintiffs and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301(3).

136.    Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)-(5).

137.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

138.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

139.    The amount in controversy of Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

140.    There are more than 100 Class members.

141.    Defendant provided Plaintiffs and each member of the Class with a written warranty and implied warranty as identified above, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

142. The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased their Class Vehicles.

143. Defendant breached these warranties. As described in more detail above, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire, leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by Defendant.

144. Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third- party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

145. Defendant's conduct as described herein, including knowledge of the defect inherent in the vehicles and the action, and inaction, in the face of the knowledge, the Defendant has failed to comply with its obligations under its written and implied promises, warranties, and representations.

146. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action, and not required to give the Defendant notice of an opportunity to cure, until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure. Furthermore, affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of the sale or lease of

each Class Vehicle, Defendant knew, or should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

147.    In its capacity as warrantor, and by the conduct described herein, any attempts by Defendant to limit the implied warranties in a manner that would exclude coverage of the defects is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defect is null and void.

148.    All jurisdictional prerequisites have been satisfied.

149.    Privity of contract is not required here because Plaintiffs and each member of the Class are intended beneficiaries of the Defendant's implied and express warranties. The warranty agreements were designed for and intended to benefit consumers only. Privity is also not required because the Class Vehicles are dangerous instrumentalities due to the Defect alleged herein.

150.    As a direct and proximate result of Defendant's breach of the written and implied warranties, Plaintiffs and each member of the Class have suffered damages.

151.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; the cost of purchasing,

leasing, or renting replacement vehicles, along with all other incidental and consequential

damages, statutory attorney fees, and all other relief allowed by law.

## COUNT II
## UNJUST ENRICHMENT

152.    Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

153.    Plaintiffs bring this individually and on behalf of Class members.

154.    FCA has knowingly received and retained a benefit from Plaintiffs and Class

members and inequity has resulted.

155.    FCA has appreciated this benefit through its unjust conduct, by selling or leasing

Class Vehicles with a concealed EGR cooler defect, at a profit, for more than these Class

Vehicles were worth, to Plaintiffs and Class members, who overpaid for these Class Vehicles,

and/or would not have purchased these Class Vehicles at all; and who have been forced to pay

other costs.

156.    It is inequitable for FCA to retain these benefits.

157.    Plaintiffs and Class members do not have an adequate remedy at law.

158.    As a result of FCA's conduct, the amount of their unjust enrichment should be

disgorged, in an amount to be proven at trial.

## COUNT III
## BREACH OF EXPRESS WARRANTY
### (Wis. Stat. §§ 402.313 and 411.210)

159.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

fully set forth herein.

160.    Plaintiffs bring this count individually and on behalf of Class members.

161.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "seller" of motor vehicles under § 402.103(1)(d).

162.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

163.    All Class members who purchased a Class Vehicle in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

164.    All Class members who leased a Class Vehicle in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

165.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

166.    In connection with the purchase or lease of the Class Vehicles, FCA provided the Plaintiffs and Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

167.    FCA's warranties formed the basis of the bargain that was reached when the Wisconsin Plaintiffs and Class members unknowingly purchased or leased Class Vehicles that came equipped with the EGR cooler defect.

168.    However, FCA knew or should have known that the warranties were false and/or misleading. Specifically, FCA was aware of the EGR cooler defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Plaintiffs and Class Members.

169.    Plaintiffs and Class members reasonably relied on FCA's express warranties when purchasing or leasing their Class Vehicles.

170.     FCA knowingly breached its express warranties to repair defects in materials and workmanship by failing to repair or replace the EGR cooler defect in the Class Vehicles. FCA also breached its express warranties by providing a product containing the EGR cooler defect that was never disclosed to Plaintiffs and Class members.

171.     As a direct and proximate result of FCA's breach of its express warranties, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wis. Stat. §§ 402.314 and 411.212)**

172.     Plaintiffs allege and incorporate by reference all preceding allegations as though fully set forth herein.

173.     Plaintiffs bring this count individually and on behalf of Class members.

174.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

175.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease, and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles suffer from the EGR cooler defect, which causes the EGR cooler to crack, leading coolant to leak into a running engine, which can cause a fire, thus causing an increased likelihood of serious injury or death, rendering the Class Vehicles inherently defective and dangerous.

176.     FCA knew at the time of the sale of the Class Vehicles that the EGR coolers were defective, and that the Class intended to use the vehicles in a manner requiring a particular

standard of performance and durability, and the Class was relying on FCA's skill and judgment to furnish suitable products for this particular purpose.

177.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "seller" of motor vehicles under § 402.103(1)(d).

178.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

179.    All Class members who purchased a Class Vehicle in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

180.    All Class members who leased a Class Vehicle in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

181.    The Class Vehicles were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

182.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

## COUNT V
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### (Wis. Stat. § 100.18, *et seq.*)

183.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

184.    Plaintiffs bring this count individually and on behalf of Class members.

185.    FCA is a "person, firm, corporation, or association" within the meaning of Wis. Stat. § 100.18(1).

186.    Plaintiffs and Class are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

187.    Class Vehicles and the defective EGR coolers installed in them are "merchandise" within the meaning of Wis. Stat. § 100.18(1).

188.    The Wisconsin Deceptive Trade Practices Act ("DTPA") prohibits any "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). In the course of its business, FCA, through its agents, employees, and/or subsidiaries, violated the DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the EGR cooler defect.  Specifically, FCA made material representations regarding the Class Vehicles expected durability over other diesel vehicles, including its own predecessor engines. FCA touted the longevity, durability, and performance of the Class Vehicles, while omitting and concealing the fact that the Class Vehicles suffered from defective EGR coolers, which create the threat of a catastrophic vehicle fire. Once FCA admitted to the defect, it represented that an EGR cooler fix was available.

189.    By misrepresenting the Class Vehicles and/or the defective EGR coolers installed in them as reliable, safe and/or free from defects, FCA violated the DTPA by making assertions, representations and statements of fact which are untrue, deceptive or misleading, as prohibited by Wis. Stat. § 100.18(1).

190.    FCA's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Class members, about the true durability and

reliability of the Class Vehicles and/or the defective EGR coolers installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

191.    FCA's misrepresentations and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and Class members, as FCA intended. Had they known the truth, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

192.    Plaintiffs and Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the fact that normal use of the Class Vehicles would cause coolant to leak and disperse throughout the vehicle's engine, leading to catastrophic engine failure and a fire. Plaintiffs and Class members did not, and could not, unravel FCA's deception on their own.

193.    FCA had an ongoing duty to Plaintiffs and Class members to refrain from unfair and deceptive practices under the DTPA in the course of their business. FCA owed the Plaintiffs and Class members a duty to disclose all the material facts concerning the EGR cooler defect in the Class Vehicles because FCA possessed exclusive knowledge, FCA intentionally concealed the EGR cooler defect from Plaintiffs and Class members, and/or FCA made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

194.    Plaintiffs and Class members suffered ascertainable losses and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

195.    FCA's violations present a continuing risk to Plaintiffs and Class members, as well as to the public. FCA's unlawful acts and practices complained of herein affect the public interest.

196.    Pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs and Class members seek an order enjoining FCA's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the DTPA.

**COUNT VI**
**BREACH OF CONTRACT**

197.    Plaintiffs incorporate by reference all allegations as though fully set forth herein.

198.    Plaintiffs bring this count individually and on behalf of Class members.

199.    As set forth above, Plaintiffs and the Class members have suffered from a defect that existed in the Class Vehicles at the time of purchase.

200.    FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's concealment and suppression of material facts concerning the durability, performance and quality of the Class Vehicles, and FCA's affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles, caused Plaintiffs and the other Class members to make their purchases or leases of their Class Vehicles.

201.    Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Class Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective EGR cooler. Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain.

202.    Each and every sale or lease of a Class Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Class Vehicles and by misrepresenting or failing to disclose material facts concerning the durability and reliability of the Class Vehicles, as well as

54

the presence of a defect in the Class Vehicles, and by affirmatively making misleading statements concerning the durability and reliability of the Class Vehicles, as well as the fact that a remedy was available for the EGR cooler defect.

203.    As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VII
## FRAUDULENT CONCEALMENT

204.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

205.    Plaintiffs bring this count individually and on behalf of Class members.

206.    FCA failed to disclose the EGR cooler defect in the Class Vehicles and affirmatively represented through advertisements and other avenues of communications, including standard and uniform materials provided with each Class Vehicle and on its website, that the Class Vehicles were safe, reliable, durable, and of high quality, and would perform and operate in a safe manner. Furthermore, FCA affirmatively misrepresented to Plaintiffs that a recall was readily available for Class Vehicles when it was not.

207.    FCA knew about the defect in the Class Vehicles when these representations were made.

208.    Any reasonable consumer would understand those representations to mean that the Class Vehicle was free from defects.

209.    FCA intentionally concealed from Plaintiffs the fact that the Class Vehicles had an EGR cooler defect.

210. FCA had a duty to disclose the dangers and risks posed by the Class Vehicles and/or the defective EGR coolers installed in them, as well as the lack of remedy, because they concerned the safety of the Class Vehicles.

211. FCA knowingly concealed these material facts from Plaintiffs and Class members to mislead them.

212. FCA had a duty to disclose the existence of the EGR cooler defect because FCA had exclusive knowledge of the material facts.

213. Plaintiffs and Class members did not know the true nature of the Class Vehicles and could not have discovered the EGR cooler defect through reasonably diligent investigation.

214. FCA took affirmative actions to conceal the material facts, including by not timely notifying NHTSA and consumers about the existence of the EGR cooler defect.

215. When Plaintiffs and Class members bought their Class Vehicles, they received no information from FCA regarding the dangerously defective EGR cooler. The failure to disclose the EGR cooler defect was consistent and pervasive. In advertising and materials provided with each Class Vehicle, the EGR cooler defect was uniformly concealed from Plaintiffs and Class members.

216. FCA intentionally concealed, suppressed and failed to disclose the EGR cooler defect in the Class Vehicles and the nature of the risk. The full and complete nature of the Defect was concealed from Plaintiffs, Class members, and the general public. FCA knew or should have known the true facts. However, FCA did not reveal the truth to Plaintiffs or the Class. Instead, FCA concealed the truth, intending that Plaintiffs and the Class would rely on their concealment, which Plaintiffs and the Class did.

217.    A reasonable consumer expects their vehicle will not burst into flames while driving under real world conditions.

218.    Defendant had a duty to disclose the true nature of the EGR cooler defect and the true nature of the recall in light of their representations.

219.    On information and belief, FCA still has not made full and adequate disclosures and continues to defraud Plaintiffs and the members of the Class by concealing material information regarding the defective EGR coolers and the recall.

220.    But for FCA's fraud, Plaintiffs and the members of the Class would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs and members of the Class have sustained damage because they purchased vehicles that diminished in value as a result of FCA's fraud, and because the vehicles are not worth the full price paid at the time of purchase. Accordingly, FCA is liable to Plaintiffs and the members of the Class for damages in an amount to be proved at trial.

221.    FCA' acts were done deliberately with intent to defraud and in reckless disregard of the rights of Plaintiffs and the Class and the safety of consumers and the public at large; and to enrich themselves through additional vehicle sales. FCA's misconduct warrants an assessment of punitive damages sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment against the FCA as follows:

a.     A declaration that any applicable statutes of limitations are tolled due to the fraudulent concealment alleged in this complaint, and that FCA is estopped from relying on any statutes of limitations in defense;

b.     An order enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

c.     An award to Plaintiffs and Class members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

d.     Injunctive and equitable relief in the form of a recall and program to repair, modify, and/or buy back all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses;

e.     Costs, restitution, compensatory damages for economic and out-of-pocket costs, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law;

f.     An FCA-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the EGR cooler defect in Plaintiffs' and Class members' Class Vehicles, can be made and paid, such that FCA, not the Class members, absorb the losses and expenses fairly traceable to the recalls of the vehicles and correction of the EGR cooler defect;

90996535.1

g.      Injunctive relief in the form of an order requiring FCA to notify all Class members that their Class Vehicles are not safe to drive, and requiring FCA to provide loaner vehicles free of charge to all Class members until all Class Vehicles have received the EGR cooler fix.

h.      A declaration that FCA must disgorge, for the benefit of Plaintiffs and Class members, all or part of the ill-gotten profits FCA received from its sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class members;

i.      An award of attorneys' fees and costs;

j.      An award of prejudgment and post judgment interest, as provided by law;

k.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: October 15, 2020                 Respectfully,

By:/s/ Samuel J. Strauss
          Samuel J. Strauss
          Sam@turkestrauss.com
          **TURKE & STRAUSS LLP**
          613 Williamson Street
          Suite 201
          Madison, WI 53703
          Telephone: (608) 237 1775
          Facsimile: (608) 509 4423

Stacey P. Slaughter, *pro hac vice forthcoming*
Sslaughter@robinskaplan.com
J. Austin Hurt, *pro hac vice forthcoming*
Ahurt@robinskaplan.com
Michael J. Pacelli, *pro hac vice forthcoming*
Mpacelli@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349 8500
Facsimile: (612) 339 4181

Aaron Sheanin, *pro hac vice forthcoming*
Asheanin@robinskaplan.com
**ROBINS KAPLAN LLP**
46 Shattuck Square
Suite 22
Berkeley, CA  94704
Telephone: (650) 784 4040
Facsimile: (650) 784 4041

*Attorneys for Plaintiffs*